***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rowell with minor modifications.
 *********** *Page 2 RULING ON EVIDENTIARY MATTERS
The objections raised by counsel at the depositions taken of Dr. Damien Doute, M.D., Herman Gore, M.D. Jerry Petty M.D. and Ria Jacobs in this matter are ruled upon in accordance with the applicable rule of law and the Opinion and Award in this case.
The objection raised by Defendant, NCSBT, in its August 2, 2005 letter is overruled.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties at the hearing and after the hearing as
 STIPULATIONS
1. All parties are properly before the Commission, and that the Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated, and there are no questions as to misjoinder or non-joinder of parties.
3. Where documents are to be entered as evidence or produced pursuant to subpoena, photocopies of said documents produced by the party in possession of the original document shall be acceptable.
4. On or about April 17, 2001, an employer-employee relationship existed between Plaintiff and Defendant-Employer, Defendant-Employer regularly employed more than three employees in the state of North Carolina, and the parties were bound by and subject to the provisions of the Act.
5. On or about August 6, 2002, an employer-employee relationship existed between plaintiff and Defendant-Employer, Defendant-Employer regularly employed more than three *Page 3 
employees in the state of North Carolina, and the parties were bound by and subject to the provisions of the Act.
6. On or about April 17, 2001, North Carolina School Board Trust was the third party administrator for the self-insured employer.
7. On our about August 6, 2002, Key Risk Insurance Company was the carrier for Defendant-Employer.
8. On or about April 17, 2001, Plaintiff sustained an injury by accident arising out of and in the course of his employment.
9. North Carolina School Trust Board filed a Form 60 dated May 18, 2001, admitting Plaintiff's right to compensation for an injury by accident on April 17, 2001.
10. Plaintiff's average weekly wage in connection with this injury by accident on April 17, 2001, is $437.35 yielding a compensation rate of $291.58.
11. Dr. Herman Gore is an authorized treating physician in connection with Plaintiff's injury by accident on April 17, 2001.
12. On or about August 6, 2002, Plaintiff sustained an injury by accident arising out of and in the course of his employment.
13. Key Risk Insurance Company filed a Form 60 dated September 6, 2002, admitting Plaintiff's right to compensation for an injury by accident on August 6, 2002.
14. Plaintiff's average weekly wage in connection with his injury by accident on August 6, 2002, is $436.13, yielding a compensation rate of $290.77.
15. Key Risk Insurance Company has continued paying temporary total disability to Plaintiff since August 6, 2002. *Page 4 
16. The parties Stipulated into evidence as Stipulated Exhibit # 1, Pre-Trial agreement, as modified and initialed by the parties.
17. The parties Stipulated into evidence as Stipulated Exhibit # 2, medical records.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 55 years old and has a ninth grade education. He is illiterate and cannot read or write. He is married with four children.
2. In 1983, Plaintiff had a cervical laminectomy due to a work-related accident at Duke Power. Plaintiff recovered fully from this surgery and eventually returned to work for several employers. He went through Job Corps, worked for Construction, Heating, and Bonding for four years as a concrete mixer and Naval dam repairer. For a year, he worked at Rea Construction Company putting in storm drains, digging ditches, and laying concrete pipes. For six years, he worked with the United States Postal Service as a clerk and mail handler.
3. Plaintiff started working for Defendant-Employer in the mid-to late-nineties. He worked in the grounds crew and maintenance department, which required him to drive trucks and other machinery, to deliver furniture, and to put playgrounds up. He had several work-related injuries to his neck and shoulder before April 2001, but none of these injuries caused him to miss significant time from work.
4. On April 17, 2001, Plaintiff injured his lower back in a work-related incident. He was putting a tractor onto his truck ramp when he lifted the ramp and felt pain in his lower back and legs. He reported the incident to his supervisor the next day and went to the doctor that *Page 5 
Defendant-Employer instructed him to see. Defendant-Employer and its Third Parties Administrator (TPA) at the time, North Carolina School Boards Trust, accepted Plaintiff's injury as compensable under a Form 60 and paid indemnity compensation at a rate of $291.58 based on an average weekly wage of $437.35, and medical compensation at various times.
5. On April 30, 2001, plaintiff presented to Dr. Robert Ladd at CaroMont Urgent Care for back pain diagnosed as a lumbosacral strain. Dr. Ladd recommended physical therapy and light duty. Plaintiff returned to CaroMont on May 7, 2001, complaining of pain radiating into his right leg, at which time he was referred for an orthopedic evaluation.
6. Plaintiff saw Dr. Robert Blake and Dr. Damien Doute on May 18, 2001, for an orthopedic consultation. On that occasion, he complained of severe pain in the lower lumbar segments, with pain going into both legs, but not below the knees. Dr. Doute suspected an annular tear of the disc, and conservative treatment consisting of non-steroidal anti-inflammatory medications and physical therapy was recommended. X-rays requested by Dr. Blake at that time disclosed degenerative disc disease as well. Plaintiff also had a lumbar MRI that confirmed degenerative changes. Degenerative disc disease is the process of a disc wearing out and can produce pain. The condition can be progressive.
7. Plaintiff returned to Dr. Blake on May 29, 2001, complaining of pain extending into the left buttock and leg. He did not mention a problem with his right leg at that time. Plaintiff's right hip and leg symptoms became more pronounced by June 12, 2001. It was noted on June 27, 2001, that plaintiff was still experiencing symptoms in both legs, right greater than left.
8. Following an attempt at conservative treatment, Dr. Blake requested an MRI, which showed a disc protrusion at L5-S1, with compression of the S1 nerve root on the right *Page 6 
side. He referred plaintiff back to Dr. Doute for a surgical consultation. Plaintiff saw Dr. Doute on August 8, 2001, at which time he gave a history of back pain that gradually radiated down both legs. Dr. Doute interpreted plaintiff's MRI as showing a paracentral disc herniation at L5-S1. On September 18, 2001, Dr. Doute performed an L5-S1 diskectomy. Dr. Doute opined that Plaintiff's disc herniated for which he performed surgery on resulted from Plaintiff's work-related injury on April 17, 2001.
9. Plaintiff reported slow improvement following surgery, indicating his legs were better two weeks post-surgery. Plaintiff's pain did not resolve. On October 29, 2001, plaintiff reported that he was still having pain in his right hip and his right knee was giving way. Dr. Doute suspected a recurrent disc herniation and on November 29, 2001, suggested that plaintiff consider an anterior lumbar fusion. He requested an enhanced MRI to determine whether plaintiff had developed scar tissue. The MRI was performed on December 5, 2001, and revealed no evidence of a disc herniation. Dr. Doute continued to recommend a lumbar fusion to address the degenerative changes in plaintiff's low back.
10. Dr. Doute released plaintiff to return to work on October 11, 2001. Although his notes did not reflect restrictions, according to Dr. Doute plaintiff would have been limited to no excessive or repetitive bending and no lifting greater than 20 to 25 pounds. According to Dr. Doute plaintiff's job as a grounds keeper would have caused plaintiff back pain. He suggested this was not the best type of work for plaintiff and that a functional capacity evaluation should have been performed. Plaintiff testified that Dr. Doute sent him back to work two weeks after surgery on September 18, 2001, when his back was still hurting. He had to miss work while continuing to be treated for his back. According to plaintiff, his back did not do any better after surgery, which led Dr. Doute to refer him to Dr. Gore. Although plaintiff returned to work with *Page 7 
the Defendant-employer after being released by Dr. Doute in October, 2001, the evidence reveals that Plaintiff performed light duty work only. He no longer mowed grass. He did not perform any of the heavy activities listed in a job description offered into evidence for grounds keepers. Plaintiff continued working in his lighter duty capacity until August 6, 2002. Plaintiff reported that his work activities increased his pain. On March 6, 2002, plaintiff reported to Dr. Doute that his pain was keeping him up at night. Dr. Doute referred plaintiff to Dr. Gore for a series of epidural steroid injections and a possible discogram.
11. Plaintiff presented to Dr. Herman Gore on March 21, 2002, complaining of pain in his lower back radiating down his right lower extremity. Plaintiff noted increasing pain with pretty much any type of activity and intermittent numbness and weakness in his legs. Dr. Gore administered trigger point injections to the soft tissues of plaintiff's back and a series of epidural steroid injections. Plaintiff was evaluated on July 15, 2002, following his third epidural steroid injection. He continued to report pain in his low back radiating down his right hip and leg.
12. Dr. Gore agreed that plaintiff had lumbar degenerative disc disease at L5-S1, with a radicular component, and that degenerative disc disease can be progressive. It can produce pain and radicular symptoms spontaneously without trauma. The condition can be progressive. Plaintiff informed Dr. Gore that the surgery performed by Dr. Doute on September 18, 2001, did not alleviate his symptoms of low back and right leg pain and that following surgery his symptoms progressively worsened. On June 18, 2002, Dr. Gore performed a lumbar discogram, which identified the L5-S1 disc space as the primary source for plaintiff's back pain. Up to that point, plaintiff had not experienced any sustained improvement in his low back symptoms.
13. Plaintiff returned to Dr. Doute on July 11, 2002, following the epidural injections administered by Dr. Gore, continuing to complain of pain. Plaintiff had responded to the *Page 8 
injections temporarily but did not get better. Plaintiff's pain had increased to the point he wanted something done about it. At that point, Dr. Doute felt most of plaintiff's pain was coming from end stage degenerative disc disease, or the wearing out of the disc to the degree that a lumbar fusion was the only treatment option. This procedure was recommended to address Plaintiff's back pain, numbness and weakness in the legs. Dr. Doute and plaintiff had a detailed discussion about the proposed surgery on July 11, 2002. The surgery was scheduled for September 18, 2002, but cancelled by plaintiff on July 25, 2002. Dr. Doute did not see plaintiff after July 11, 2002.
14. Plaintiff sustained a second admittedly compensable injury by accident rising out of and in the course of his employment with the Defendant-employer on August 6, 2002, when he was involved in a motor vehicle accident. The Defendant-employer and Key Risk admitted compensability for a neck injury with a Form 60 dated September 6, 2002. Plaintiff filed a Form 18 on September 5, 2002, alleging injuries to his neck, right shoulder and mid-back. These Defendants stipulated that they have continued to pay Plaintiff temporally total disability since August 6, 2002.
15. On August 6, 2002, plaintiff and several co-workers were delivering furniture to local schools. On the occasion in question, plaintiff was driving a 1980 GMC 14' box truck with a gross weight of 27,500 pounds. The truck was equipped with a lift gate on the rear. Plaintiff had stopped his vehicle at an intersection on Clay Street in Gastonia, when it was struck from the rear by a 1989 Chevrolet 3500 utility bed truck with a gross weight of 4,536 pounds being operated by Blake Powell, a co-employee. Photographs of the vehicles taken at the scene showed a minor dent to the hood and grill of the Powell vehicle and no damage to the vehicle operated by plaintiff. Plaintiff acknowledged there was no damage to the vehicle he was driving, *Page 9 
which he described as a big delivery truck. The accident was investigated on August 7, 2002, by the Gastonia Police Department. The investigating officer estimated the speed of the Powell truck at impact at 10 miles per hour.
16. Following his motor vehicle accident on August 6, 2002, plaintiff was able to get out of his vehicle at the scene. He did not request medical treatment. The next day plaintiff provided information to Jim Parks, the employer's Director of Facility Services, to complete a mandatory incident report. Plaintiff reported that, at the time of the accident, he heard tires squeal and felt a bump. Plaintiff also reported that he felt all right at that time. The motor vehicle accident plaintiff was involved in on August 6, 2002, as evidenced by photographs of the vehicles taken at the scene was a minor accident. Plaintiff's description of the accident to Mr. Parks on August 7, 2002, as a bump to the vehicle he was driving was consistent with the minor damage to the Powell vehicle, the absence of any damage to the vehicle plaintiff was operating, the relative size of the two vehicles, (including the lift gate on the rear of plaintiff's truck), and the investigating officer's estimate that the Powell vehicle was traveling approximately 10 miles per hour at impact. Plaintiff's description of the accident at the hearing that the Powell vehicle was traveling 45-50 miles per hour at impact is contrary to the greater weight of the evidence and is thereby to be given little to no weight.
17. Plaintiff has not returned to work with Defendant-employer or with any other employer since August 6, 2002. Following August 6, 2002, Defendant-employer has not offered Plaintiff a job within his restrictions as a result of either his compensable April 17, 2001 injury by accident, or his compensable August 6, 2002 injury by accident.
18. On August 7, 2002, Plaintiff presented to Dr. Robert Ladd at CaroMount Urgent Care with complaints of cervical and right shoulder pain and low back pain. Plaintiff was taken *Page 10 
out of work until August 9, 2002, and then placed on light duty restrictions of no bending/ pushing/ pulling, no driving, and no lifting more than five (5) to ten (10) lbs. Due to Plaintiff's complaints of back and neck problems these same light duty restrictions were continued. Plaintiff's light duty restrictions continued and on September 26, 2002, Plaintiff was referred for a neurological evaluation regarding his cervical problems.
19. Following August 7, 2002, and during this period of time that plaintiff remained on light duty restrictions, he was also being seen by Dr. Gore for his low back problems. Plaintiff was not allowed to return to work with Defendant-employer while under these light duty restrictions giving following August 7, 2002.
20. Following the motor vehicle accident, plaintiff presented to Dr. Gore on August 12, 2002, for a follow up evaluation for his work-related injury of April 17, 2001. Plaintiff reported his motor vehicle accident and complained of pain in his neck and low back, with radiating pain in his left lower extremity. Plaintiff and Dr. Gore discussed whether plaintiff was going to have the surgery Dr. Doute recommended on July 11, 2002. Dr. Gore did not address plaintiff's neck symptoms, which he understood were being treated by another physician. The only treatment Dr. Gore ever rendered plaintiff was for his low back. Any left leg pain plaintiff developed following the motor vehicle accident on August 6, 2002, was transient in nature and completely resolved within 4 weeks following the motor vehicle accident.
21. Dr. Gore last saw plaintiff on July 15, 2002, prior to his accident on August 6, and saw him for the first time thereafter on August 12, 2002. He performed a clinical examination on both visits. Comparing his physical examinations for these two visits, Dr. Gore noted that the physical, neurological, muscoskeletal and lumbar spine findings were identical. He actually documented findings of lumbar tenderness and segmental motion on July 15, 2002, that were not *Page 11 
present on August 12. Dr. Gore's impression of plaintiff's clinical examination on August 12, 2002, was identical to July 15. Dr. Gore acknowledged that, even though plaintiff reported a motor vehicle accident on August 6, 2002, his clinical examinations on July 15 and August 12, 2002, were the same, except for a complaint of neck pain on August 12.
22. On September 16, 2002, Dr. Gore ordered a lumbar MRI for plaintiff due to a complaint of left leg pain following the motor vehicle accident. The MRI was performed on October 9, 2002, and reviewed by Dr. Gore on October 24, 2002. The MRI did not show a recurrent disc herniation. It did not disclose any findings that were different from plaintiff's MRI findings prior to his motor vehicle accident. Plaintiff still had degenerative discogenic pain of the low back, which was the same problem Dr. Gore had treated plaintiff for since March 21, 2002. Dr. Gore's clinical examination and diagnostic studies did not disclose any evidence of injury associated with plaintiff's motor vehicle accident other than his complaint of neck and left leg pain. Dr. Gore could not say to any degree of medical probability whether plaintiff's low back symptoms were related to the motor vehicle accident, his prior lifting injury, or progressive degeneration of his spine. He did not dispute plaintiff's testimony at the hearing that his left leg symptoms resolved within one month after the motor vehicle accident.
23. Dr. Gore acknowledged that plaintiff's low back pain continued at the same level as prior to the motor vehicle accident. Dr. Gore never made an assessment of whether there was a material aggravation of plaintiff's low back condition as a result of his motor vehicle accident. He deferred to the physician who treated plaintiff for his neck injury on any disability associated with that condition.
24. During his deposition, Dr. Doute was asked to compare the MRI he obtained of plaintiff's lumbar spine on December 5, 2001, with the report for the MRI obtained by Dr. Gore *Page 12 
on October 9, 2002, following the motor vehicle accident. According to Dr. Doute based on his review of the two studies, there was nothing to suggest any change due to trauma. There was no pathology present in October 9, 2002, that was not present prior to the motor vehicle accident. There was nothing present on the October 9, 2002 study that would have changed his recommendation on July 11, 2002, for a spinal fusion. There was nothing present on the October 9, 2002, MRI to suggest there had been a material pathological aggravation of plaintiff's preexisting low back condition since he had last seen plaintiff on July 11, 2002.
25. Following Plaintiff's referral for neurological evaluation for his cervical problems by Dr. Robert Ladd on September 26, 2002, and while under light duty restrictions for his neck and low back problems, Plaintiff was seen by Dr. Jerry Petty, a neurosurgeon. Dr. Petty had previously treated plaintiff for a cervical problem in 1997 following a work related incident. Plaintiff had a prior history of cervical surgery in 1983. Dr. Petty obtained an MRI in August, 1997, that confirmed degenerative changes in the neck. Plaintiff's neurological examination throughout Dr. Petty's care was normal. Dr. Petty discharged plaintiff in September, 1997.
26. Plaintiff returned to Dr. Petty on January 14, 2003, with a history of being involved in a motor vehicle accident. He complained of pain in his neck and arm. An MRI performed subsequent to the motor vehicle accident revealed degenerative changes of the cervical spine, which were inconsistent with plaintiff's complaints. Dr. Petty observed that the cervical MRI performed after the motor vehicle accident was not too different from the MRI taken in 1997. Plaintiff's clinical examination on January 14, 2003, was normal and did not explain his complaints. Plaintiff did not have a surgical problem. He had no evidence based on his clinical examination and diagnostic studies of an acute injury. Dr. Petty felt plaintiff's degenerative disc disease was sufficient to explain Plaintiff's symptoms. Plaintiff's only *Page 13 
symptom was pain, and this was the only condition Dr. Petty treated. On March 11, 2003, plaintiff reported that his biggest problem was his lower back and legs.
27. Dr. Petty recommended that plaintiff return to work at some level, because he was physically capable of working by February 11, 2003. On February 11, 2003, Dr. Petty told Plaintiff he could return to work with the only with restriction being to avoid to placing his head in an unusual position. The only basis for this restriction was plaintiff's subjective complaint of pain. Plaintiff returned on July 20, 2004. On that occasion, Dr. Petty noted that plaintiff had enough degenerative disc disease in the upper cervical spine to cause his symptoms. The degenerative changes in plaintiff's neck did not result from the motor vehicle accident. On September 2, 2004, Dr. Petty gave plaintiff another note to return to work with restrictions of no lifting greater than ten pounds and to avoid turning his head repeatedly. These restrictions were again based entirely on plaintiff's subjective complaints. Plaintiff had no restrictions on his physical activities. Dr. Petty never took plaintiff out of work due to his cervical problems.
28. After giving careful consideration to the competent credible evidence in its entirety, it is determined that the greater weight of the evidence at most shows a temporary aggravation of Plaintiff's pre-existing neck condition following his August 6, 2002 injury by accident. From the evidence of record, this temporary aggravation resulted in disability to Plaintiff from August 7, 2002 and lasted only until February 11, 2003, when Dr. Petty determined Plaintiff was capable of work and his only restriction being to avoid placing his head in an unusual position.
29. The problem with plaintiff's low back after April 17, 2001, was degenerative disc disease at L5-S1. This process tends to be progressive and can produce pain and radicular symptoms spontaneously without trauma. Even though Dr. Doute corrected plaintiff's disc *Page 14 
herniation on September 18, 2001, Plaintiff continued to have noticeable symptoms of back and leg pain. Even prior to the MRI performed on December 5, 2001, Dr. Doute recommended a lumbar fusion to address the degenerative changes in plaintiff's low back.
30. Plaintiff did not undergo a substantial change in the condition of his low back as a proximate result of his injury by accident on August 6, 2002.
31. A review of the evidence in its entirely, inclusive of the medical evidence, fails to establish that the motor vehicle accident on August 6, 2002, materially aggravated or accelerated plaintiff's preexisting low back condition.
32. Plaintiff was taken out of work by Dr. Gore due to his low back pain and problems on September 24, 2002. Dr Gore, Plaintiff's authorized treating physician for his low back, has not released him to return to work with respect to his low back at any time following September 24, 2002. Dr. Gore never treated plaintiff for his cervical condition. He deferred to Dr. Petty regarding any disability related to Plaintiff's neck problems.
33. After giving careful consideration to the competent credible evidence in its entirety, it is determined that the greater weight of the evidence shows that Plaintiff's disability since February 11, 2003, has resulted from his low back injury on April 17, 2001.
34. Defendant-employer and Key Risk Insurance Company are entitled to reimbursement from Defendant NCSBT, for the disability compensation they have paid on Plaintiff's claim since February 11, 2003.
35. Plaintiff is entitled to have Defendant, Key Risk Insurance Company, pay for medical treatment necessitated by his August 6, 2002 compensable injury, which resulted in the aggravation of Plaintiff's pre-existing neck condition, including but not limited to medical treatment received by CaroMount Urgent Care and by Dr. Petty. *Page 15 
36. Plaintiff is entitled to have Defendant, NCSBT, pay for the medical treatment necessitated by his April 17, 2001 compensable injury, including but not limited to his September 18, 2001 surgery and treatment recommendations from his authorized treating physicians Dr. Doute and Dr. Gore.
37. The deposition testimony of Ria Jacobs, Vocational Rehabilitation Case Manager, was taken in this matter. It was clear from a reading of the deposition testimony given by Ms. Jacobs, especially her testimony given on cross-examination, that any opinion she rendered regarding suitable jobs available in the local market and that Plaintiff was capable of obtaining (taking into consideration his physical and mental limitations) are to be given little weight.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained compensable injuries arising out of and in the course of his employment with the Defendant-employer on April 17, 2001, and August 6, 2002. N.C. Gen. Stat. § 97-2(6). The Defendant-employer admitted plaintiff's right to compensation following each injury on an I.C. Form 60.
2. The injury plaintiff sustained on April 17, 2001, was to his low back. Plaintiff sustained an injury to his neck as a result of the motor vehicle accident on August 6, 2002. The motor vehicle accident on August 6, 2002, did not materially aggravate or accelerate plaintiff's pre-existing back condition. The greater weight of the evidence at most shows that Plaintiff's August 6, 2002 compensable injury resulted in a temporary aggravation of Plaintiff's pre-existing neck condition. Workers injured in compensable accidents are entitled to be *Page 16 
compensated for all disability caused by and resulting from the compensable injury. Heatherly v. Montgomery Components, Inc.,71 N.C.App. 377, 323 S.E.2d 29 (1984), disc. review denied, 313 N.C. 329,327 S.E.2d 890 (1985). When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct. Roper v. J.P. Stevens Co., 65 N.C.App. 69,308 S.E.2d 485 (1983), disc. review denied, 310 N.C. 309, 312 S.E.2d 652
(1984) (quoting Starr v. Charlotte Paper Co., 8 N.C.App. 604,175 S.E.2d 342, cert. denied, 277 N.C. 112 (1970)). Where the intervening event is another compensable work-related injury, the general rules for aggravation of a preexisting condition apply. When an employee afflicted with a preexisting disease or infirmity suffers a personal injury by accident arising out of and in the course of his employment, and such injury materially accelerates or aggravates the preexisting disease or infirmity and thus proximately contributes to the death or disability of the employee, the injury is compensable. . . Anderson v. NorthwesternMotor Co., 233 N.C.App. 372, 64 S.E.2d 265 (1951) (emphasis added). Dr. Doute specifically testified there was nothing present on plaintiff's October 9, 2002, MRI to suggest there had been a material aggravation of plaintiff's preexisting low back condition from the time he had last seen plaintiff on July 11, 2002. Dr. Doute's opinion is supported by the fact that clinical examinations performed by Dr. Gore before and after plaintiff's motor vehicle accident were identical, except for a complaint of neck pain and transient left leg pain, which plaintiff testified resolved within 4 weeks following the accident.
3. The greater weight of the evidence, inclusive of the medical evidence, establishes that plaintiff's low back and leg pain after August 6, 2002, was not caused by the motor vehicle *Page 17 
accident on August 6, 2002. The North Carolina Supreme Court recently restated the rule of medical causation in workers' compensation cases as follows:
 In a workers' compensation claim, the employee has the burden of proving that his claim is compensable although the employment-related accident need not be the sole causative force to render an injury compensable, the plaintiff must prove that the accident was a causal factor by a preponderance of evidence.
 In cases involving complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. However, when such expert opinion testimony is based merely upon speculation and conjecture . . . it is not sufficiently reliable to qualify as competent evidence on issues of medical causation. [T]he evidence must be such as to take the case out of the realm of conjecture and remote possibility, that is, there must be sufficient competent medical evidence tending to show a proximate causal relation.
Holley v. ACTS, Inc., 357 N.C. 228, 231-32, 581 S.E.2d 750, 752-53
(2003) (internal citations omitted). The medical evidence failed to establish that plaintiff's low back and leg pain after August 6, 2002, proximately resulted from the motor vehicle accident as evidenced by the fact that plaintiff was experiencing progressively worsening low back pain prior to the accident; his clinical examinations before and after the motor vehicle accident were the same; his diagnostic studies before and after the accident were the same, without evidence of trauma, and plaintiff had already developed end stage degenerative disc disease prior to the motor vehicle accident, which in the opinion of his physicians was a progressive condition that could spontaneously produce pain. According to Dr. Gore, the intensity of plaintiff's low back pain was the same before and after the accident. Neither Dr. Doute nor Dr. Gore related plaintiff's low back condition after August 6, 2002, to the motor vehicle accident to any degree of medical probability.
4. Plaintiff's disability for his neck injury related to the motor vehicle accident lasted only until February 11, 2003, when according to Dr. Petty plaintiff was capable of work with *Page 18 
only a restriction to avoid placing his head in an unusual position. Plaintiff presented insufficient evidence to show that subsequent to February 11, 2003, he was taken out of work by Dr. Petty or any other physicians as a result of his August 6, 2002 compensable injury to his neck. An injured employee has the burden of proving the nature and extent of his disability. Clark v. Wal-Mart, 360 N.C. 41, 619 S.E.2d 491
(2005).
5. The Defendant-employer and Key Risk paid compensation to plaintiff after August 6, 2002, under the good faith belief that plaintiff's disability following the motor vehicle accident was due to his neck condition. Following a full evidentiary hearing, the record now demonstrates that plaintiff has not been disabled, as a result of his neck condition since February 11, 2003. Where an employer or carrier has made payments to the employee or his dependents pending a final disposition of the claim and it is determined that different or additional employers or carriers are liable, the Commission may order any employers or carriers determined liable to make repayment in full or in part to any employer or carrier that has made payments to the employee. N.C. Gen. Stat. § 97-86.1(d). The Defendant-employer and Key Risk are entitled to reimbursement from Defendant, NCSBT, for the disability compensation they have paid on Plaintiff's claim since February 11, 2003.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant, NCSBT, shall reimburse the Defendant-employer and Key Risk for all disability compensation paid by the Defendant-employer and Key Risk to plaintiff since February 11, 2003. Since plaintiff's compensation rate for his August 6, 2002, injury was less *Page 19 
than his compensation rate for his April 17, 2001 injury, NCSBT shall reimburse the Defendant-employer and Key Risk in full for all payments made since February 11, 2003, and reimburse plaintiff for any underpayment during said period due to plaintiff's higher compensation rate on April 17, 2001. The Defendant-employer and Key Risk are authorized to stop payment of temporary total disability benefits immediately. Defendant, NCSBT, shall pay plaintiff temporary total disability at the rate of Two Hundred Ninety-One and 58/100 ($291.58) Dollars, commencing immediately and continuing until further order of the Commission.
2. Defendant, NCSBT, shall pay all medical expenses incurred or to be incurred for treatment of plaintiff's low back injury on April 17, 2001, when bills for the same have been submitted to and approved by the Industrial Commission.
3. The Defendant-employer and Key Risk shall pay all medical expenses incurred or to be incurred for treatment of plaintiff's neck injury on August 6, 2002, when bills for the same have been submitted to and approved by the Industrial Commission.
4. An attorney's fee of twenty-five (25%) percent of all future disability compensation due plaintiff is hereby approved for plaintiff's attorney. Defendants shall pay every fourth disability payment directly to plaintiff's attorney.
5. Defendants shall jointly pay expert witness fees as previously approved by the Commission and the costs.
This 24th day of October 2006.
S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 20 
CONCURRING:
 S/______________ THOMAS J. BOLCH COMMISSIONER
 S/______________ PAMELA T. YOUNG COMMISSIONER *Page 1